UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————————————X
                                        :
ROBERT MAJORS                           :
                                        :        **COMPLAINT**
                        Plaintiff,      :
                                        :        ___ CV ____
            -against-                   :
                                        :        (Jury Trial Demanded)
THE CITY OF NEW YORK; New York City Police :
Department Detective PAUL HEIDER,       :
Det. MICHAEL SAPRAICONE, Det.           :
STACY CALANTJIS and Det. WILLIAM NEVINS.    :
                                        :
                                        :
                        Defendants.     :

————————————————————————————————X

ROBERT MAJORS, by his attorneys THOMAS HOFFMAN, ESQ. and

JONATHAN HILES, ESQ., complaining of the defendants, respectfully alleges, upon

information and belief, as follows:

## INTRODUCTION

Throughout the 1990s and 2000s, the Queens County District Attorney's Office

had a "win at all costs" culture and indifference to prosecutorial misconduct that violated

the constitutional rights of criminal defendants.  This climate of impunity caused Queens

prosecutors to conceal evidence of Robert Majors' innocence in order to "win" a

conviction for a 1997 double attempted murder and robbery Mr. Majors did not commit.

The prosecutors succeeded, securing Majors' conviction, in 2001, on two counts of

attempted murder and robbery, which carried a 50 years-to-life prison sentence. For many

years, Majors believed he would die in prison for crimes he didn't commit. Then, in

2018, Majors obtained a 21 year-old affidavit, witnessed by police detectives days after the attempted murders/robbery, in which an informant provided credible, well-corroborated evidence exonerating Majors and identifying the actual perpetrators. While police and prosecutors credited the affidavit, they concealed it from Majors for 21 years. In May 2020, Queens Supreme Court Judge John B. Latella vacated Mr. Majors' attempted murder and robbery convictions, finding that the suppression of the affidavit had violated Majors' constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Judge Latella also found the government had failed, despite an unequivocal court order, to disclose an eyewitness' description of the perpetrators that excluded Mr. Majors, in violation of *Brady*.

This lawsuit seeks to hold the Defendant City of New York accountable because these *Brady* violations and other unlawful acts foreseeably resulted from the deliberate indifference of policymakers from the Queens County District Attorney's Office ("D.A.'s Office" or "QCDAO") to patterns of similar constitutional violations, committed over many years, by their prosecutors. In the 10 years preceding Mr. Majors' conviction, there were 52 documented instances in which New York State and federal courts reversed convictions because Queens trial prosecutors deprived defendants of their constitutional rights by suppressing *Brady* material, failing to correct false testimony, delivering improper summation remarks, and other misconduct. *See* Exhibit A, Queens Convictions Reversed for Prosecutorial Misconduct, 1985-2017. None of the prosecutors in these 52 cases were disciplined or reprimanded in any way. Instead, they were rewarded for "winning" convictions with salary increases, promotions and glowing evaluations.

Queens District Attorney Richard Brown ("D.A. Brown"), who served as D.A. from 1991 to 2019, was aware of the pervasive misconduct in his office. As he wrote in a 1998 memo regarding an appellate reversal that condemned a prosecutor's "egregious" violations: "[W]e have been getting away with this stuff for a long time." Rather than correct course, D.A. Brown and other QCDAO policymakers and supervisors continued to disregard or condone misconduct. This 42 U.S.C. § 1983 action seeks to compensate Mr. Majors for the wrongful incarceration he endured as a result of this systemic prosecutorial misconduct. It also seeks to compensate Mr. Majors for the unlawful acts of New York City police officers, who fabricated evidence of Mr. Majors' guilt and conspired with Queens prosecutors to conceal evidence of his innocence.

## I.  NATURE OF ACTION, JURISDICTION AND PARTIES

1. This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law, arises from the wrongful prosecution and conviction of ROBERT MAJORS due to egregious police and prosecutorial misconduct that caused him to spend more than a decade in prison for crimes he did not commit.

2. On May 18, 2020, after a four day hearing, Judge Latella set aside Robert Majors' conviction on two counts of attempted murder and robbery, as well as criminal possession of stolen property, based on the defendants' failure to disclose two pieces of evidence showing Majors did not commit these crimes. *First*, the QCDAO had concealed an affidavit from a police informant, Kevin McKinney, identifying three other people, but not Mr. Majors, as the perpetrators. *Second*, police and prosecutors

concealed reports from an eyewitness, Desiree Stone, whose description of the perpetrators did not match Majors. On October 20, 2020, Judge Latella dismissed with prejudice the two counts of attempted murder and robbery.

3. The evidence exculpating Majors was suppressed during his trial in 2000 and retrial in 2001 and then for an additional 17 years by attorneys in the QCDAO's Appeals Bureau and Freedom of Information Law (FOIL) Unit.

4. The individual Detectives named in this lawsuit also intentionally concealed evidence of Mr. Majors' innocence.

5. Majors' lawsuit also names the City of New York as defendant for the misconduct of its employees and the subsequent 20-year cover-up that was caused by the City's (a) policies, customs, and practices, (b) deliberate indifference to the likelihood that constitutional violations like the ones suffered by Majors would occur, and (c) the failure of the City to supervise and discipline employees who committed such misconduct, notwithstanding that such misconduct was rampant before and during the time MAJORS was arrested, prosecuted, and convicted.

6. When prosecutorial misconduct was exposed, policymakers at the QCDAO failed to meaningfully investigate the misconduct or whitewashed it, took no disciplinary action against the offending prosecutors and instead praised and promoted them, and gave them salary increases, thereby emboldening and encouraging constitutional violations to continue. The City was deliberately indifferent to the misconduct despite abundant evidence and argument that QCDAO prosecutors suppressed *Brady* material

and used false, misleading evidence and argument that violated the constitutional rights of criminal defendants.

7. In addition, the QCDAO under former D.A. Brown maintained affirmative, unconstitutional policies that directly led the trial prosecutor in Majors' case to conceal *Brady* material, to not correct false testimony and to allow QCDAO prosecutors to continue to cover up their misconduct after Majors was convicted.

8. As a result of defendants' actions, Majors is entitled to substantial compensatory and punitive damages.

## JURISDICTION, VENUE & CONDITIONS PRECEDENT

9. This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

10. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

12. On January 4, 2021, Robert Majors filed with Defendant City of New York a timely Notice of Claim under General Municipal Law § 50-e. Thereafter Majors' General Municipal Law § 50-h hearing was held on March 31, 2021.

13. More than 90 days have elapsed since Majors' submission of his notice of claim and 50-h hearing. Majors has complied with all conditions precedent to commencement of this action.

## **THE PARTIES**

14. Plaintiff Robert Majors is a citizen and resident of the State of New York and of the United States.

15. Defendant, CITY OF NEW YORK ("CITY"), of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and governs in the Eastern District of New York.

16. Defendants Detective Paul Heider, Michael Sapraicone, and Stacy Calantjis (sometimes jointly "Investigative Detectives") were detectives employed by the New York City Police Department ("NYPD"), and acted toward Majors under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY, and acted within the scope of their employment, in violating Mr. Majors' constitutional rights. Each is sued in their individual and official capacities.

## I.   **FACTS COMMON TO ALL CAUSES OF ACTION**

### A.  Crime

17. At 10:20 a.m. on May 9, 1997, three black males shot and robbed off-duty detective Arthur Pettus and retired police officer Joseph Bellone as they were delivering cash payroll to Positive Promotions, a business located at 40-01 168th Street in Flushing, Queens. ("The Crime")

18. After shooting the victims and taking the cash payroll, the three perpetrators fled the scene in a green Ford Aerostar van.

19. The van sustained a flat tire, caused by a bullet, and came to a halt less than one mile away, at the intersection of 162nd Street and 45th Avenue, in Flushing, Queens.

20. At that location the three perpetrators abandoned the van and boarded a New York City bus and completed their escape. The Crime was committed by Aaron Boone, Bernard Johnson and a third perpetrator, either "Rasheed" (aka "Country"), or Kevin C. McKinney. Like Boone and Johnson, Rasheed, McKinney and Boone were members of the SpeedStick gang.


## B. Apprehension and Arrest of Majors

21. Within hours of The Crime, police found and identified Boone's fingerprints in the abandoned getaway van. The next morning, May 10, 1997, police surveilled Boone's house.

22. That morning Boone telephoned Majors. Majors was Boone's brother-in-law through his marriage to Boone's sister, Georgielle Majors. Boone asked Majors to drive him to the train station where he was traveling to a club he owned in Blythewood, South Carolina.

23. At the time, Majors was 31 years old and father to his and Georgielle's four year-old daughter He was employed as an admitting clerk Queens Hospital Center.

24. When Majors arrived at Boone's home, Boone asked Majors to put his (Boone's) duffel into Majors' car. Majors complied. Noticing the duffel bag was unusually

heavy, Majors looked inside of it and saw that the bag contained guns. Moments later, just as Majors began driving, he spotted police cars following him.

25. Majors, who had previously served 3 1/2 years for gun possession, panicked. He stopped the van and attempted to discard the duffel bag.

26. Police arrested Majors and recovered the duffel bag containing the weapons.[1]

27. Boone was arrested at the same time as Majors and taken to the 109th police precinct. At the precinct Boone made a statement implicating himself and exonerating Majors. Boone told detectives John Gillen and Michael Sapraicone "that he felt bad for his brother in law Robert - because he hadn't done anything other than to do him a favor by taking the bag with the guns someplace for him and he hadn't told Robert were (sic) yet, because he wasn't sure himself… I asked him if his brother in law was involved yesterday. He stated 'no.' and had not done anything other than to do him a favor by taking his bag."

28. Majors was also taken to the 109th precinct. At the precinct two detectives, whose names Majors does not currently know, tried to get Majors to confess to the shooting and robbery of off-duty detective Arthur Pettus and retired police officer Joseph Bellone. Over 20-30 minutes, the two detectives, taking turns, repeatedly struck Majors while he was handcuffed to a chair in the ribs with their fists and a phone

---

[1] As discussed *infra* at ¶¶ 36-37, Majors was ultimately convicted of weapons possession, for which he was sentenced to a minimum term of 12 years in prison. Majors does not seek damages for these 12 years of imprisonment, but rather for the 10 years he was imprisoned after he would have been eligible for parole, but for his wrongful convictions for attempted murder and robbery.

receiver.[2] Majors did not confess because he had not participated in The Crime in any way, shape or form.

29.  That same evening Majors gave a written statement to Detective Heider explaining that he had just been doing his brother-in-law Aaron Boone a favor and had not known there were weapons in the bag and was not involved in The Crime. After Majors gave his statement denying his involvement, Heider told Majors, "you're going upstate anyway."

30.  At the time of Majors' arrest the detectives recovered from Majors an appointment card for May 9, 1997 at 10:00 a.m. at the chiropractor's office of Dr. Carol Schuster. Majors was receiving treatment for a back injury he had sustained in a previous car accident. The Crime took place 6.3 miles from Dr. Schuster's office at 10:20 a.m. according to surveillance footage. Majors used public transportation to travel to Dr. Schuster's office.  Majors was at Dr. Schuster's office when the crime occurred.

31.  Committed to charging Majors regardless of whether he committed The Crime, the investigative detectives, contrary to police practice and procedure, did not take a single step to investigate Majors' alibi, nor did they attempt to speak to Dr. Schuster.

### C.  Procedural History of Majors' Trials

32.  Majors was first jointly tried with co-defendant Boone from February 8 to March 10, 2000.

---

[2] Police may have resorted to abusive interrogation tactics in part because the victims of The Crime were members of the law enforcement community.

33. On March 10, 2000, the jury convicted Majors of two counts of attempted murder in the second degree, robbery in the first degree and possession of weapons and stolen property. The Hon. Steven W. Fisher, who presided over the jury trial, sentenced Majors to a total of 90 ½ years-to-life in prison.

34. On March 28, 2000, Majors moved pursuant to CPL § 440.10 to vacate his convictions on the grounds that jurors improperly used a transit map during their deliberations to calculate that Majors could have had sufficient time to travel from his chiropractor's office to participate in the shooting and robbery. Majors' chiropractor, Carole Schuster, had testified at trial that Majors had visited her office for a 10 a.m. appointment on the morning of the Crime, which commenced at 10:20 a.m. On July 10, 2000, Judge Fisher granted Majors' motion and vacated the conviction on all counts except for the weapons possession charge.

35. At his second trial, Majors waived his right to a jury. The bench trial was held on October 29—November 8, 2001 and was presided over by the Hon. John B. Latella.

36. On November 8, 2001, Judge Latella found Majors to be guilty of attempted murder in the second degree, robbery in the first degree, and stolen property in the third degree.

37. On December 5, 2001, Judge Latella sentenced Majors to 25 years-to-life on each count of attempted murder to run consecutively with the 12 years-to-life sentence Majors received for his prior conviction for weapons possession. The robbery and stolen property sentences ran concurrently.

**D. The Government's "Evidence" Against Majors**

38. The lead prosecutor at Majors' jury trial and bench trial, as well as a pretrial suppression hearing, was ADA James Evangelou, Esq. He was assisted by ADA Andrea Eckhardt.

39. There was no forensic evidence from the escape can or the weapons that connected Majors to The Crime.

40. The prosecution evidence against Majors was of three kinds. The first prosecution evidence was that Majors briefly possessed a duffel bag with the weapons on the day following The Crime and attempted to dispose of the duffel when he spotted police.

41. Second, there was the shaky and inconsistent testimony of two eyewitnesses, New York City bus driver Kerwin Charles and motorist Reuben Cherena, who saw the perpetrators abandon the green getaway van and board a public bus approximately one mile from the crime scene. Both Charles and Cherena allegedly identified Majors in lineups supervised by Det. Heider as one of three men they observed running from the green getaway van and boarding the public bus. The statements by the two eyewitnesses at the lineup were inconsistent, as Charles said that the second perpetrator to board the bus—supposedly Majors—was wearing a yellow jacket while Cherena said the second person to run was not wearing a yellow jacket and was carrying a black jacket under his arms.

42. The third prosecution evidence consisted of telephone records that included 10 calls from May 3 to May 10, 1997 between the home of Robert and Georgielle Majors and the home of Aaron Boone and Anna Boone, who was Aaron's and Georgielle's

mother. Also introduced into evidence were two May 10, 1997 telephone calls from the residence of Boone's girlfriend to Robert Majors' home. These calls were from Boone asking Majors to take him to the train station. The prosecution portrayed these calls as being between co-conspirators. The previous calls between Majors' house and Boone's house were in fact benign calls between Majors' wife, Georgielle, and her mother, Anna.[3]

### 1. Kerwin Charles

43. Kerwin Charles was an MTA bus driver who briefly saw the three perpetrators when they boarded his bus.

44. Cherena allegedly identified Majors in a lineup supervised by Detective Heider, the same detective who witnessed and concealed McKinney's Affidavit. Det. Heider suggested the identification of Majors to Charles.

45. At the bench trial, Charles identified Majors as the second perpetrator to board the bus and described him as wearing a yellow jacket.

46. Charles's testimony contradicted his initial statement to police that the man wearing the yellow jacket boarded the bus first, not second, and shouted, "pay up, pay up." Charles further testified that Majors, upon boarding the bus, stopped at the cash box while calling back to the third perpetrator, "pay up, pay up."

47. Charles's testimony at the bench trial differed significantly from his testimony at the jury trial, held 19 months earlier.

---

[3] There were no calls between the homes of Majors and Johnson, the mastermind of the crime, even though there were 21 calls in the month before the Crime between Boone and Johnson.

48. At the jury trial, Charles testified that the second perpetrator did not stop at the cash box but instead went "straight to the back of the bus." When Charles was asked by the prosecutor to make an in-court identification of Majors' he pointed to Majors' 6'3" African American attorney, William Martin, Esq., as the second perpetrator to board the bus. Majors is 5'8" tall.

49. In light of Charles's changing story and inability to make an independent identification, the contradictions between Charles's and Cherena's alleged descriptions of Majors, the fact that Majors did not participate in The Crime, and the Investigative Detectives' other misconduct, it is likely the Investigative Detectives fed Charles his testimony inculpating Majors as well as his alleged lineup identification.

## 2. Reuben Cherena

50. Reuben Cherena was in his vehicle and stopped at a red light beside the green Ford Aerostar van the perpetrators had used for their escape.

51. Cherena saw three black males get out of the van and run onto a public bus. All three perpetrators were running.

52. Cherena allegedly identified Majors in a lineup supervised by Detective Heider. Det. Heider suggested the identification of Majors.

53. According to Cherena, Bernard Johnson was the first to exit the van and run to the bus, Majors was the second, and Boone was the third.

54. Since the three perpetrators were running away from where Cherena sat in his car, Cherena only glimpsed the second perpetrator's face when that perpetrator turned quickly to look for oncoming traffic.

55. As noted, in contrast to Charles, who had testified that the second perpetrator to board the bus was wearing a yellow jacket, Cherena testified that the second perpetrator was carrying a black jacket under his arms.

56. While Cherena made an in-court identification of both Johnson and Boone he could not make an in-court identification of Majors at either the jury or bench trial. Cherena's inability to independently identify Majors further supports the fact that Det. Heider suggested Cherena's lineup identification of Majors.

57. At least three other witnesses viewed lineups and were unable to identify Majors. Two had the same opportunity as Cherena to observe the three perpetrators running from the getaway van to the bus: The first, Cherena's wife Sherley Lopez, who was sitting next to her husband; the second, Ian Bond, a pedestrian standing at the intersection of 45th Avenue and 162nd Street, who saw all three perpetrators running to the bus; and the third, Yaneth Baburka, who saw the perpetrators when they were inside the van and was able to identify Boone but not Majors.

### D. The Suppressed *Brady* Material

58. As the U.S. Supreme Court held in *Brady v. Maryland,* 373 US 83, 87 (1963) and *Giglio v. U.S.,* 405 U.S. 150, 154 (1972), the U.S. Constitution requires the government to disclose information that is favorable to the accused.

59. The *Brady* and *Giglio* rules are intended to enable defendants to show innocence, discredit the prosecution case, impeach a witness, or show that the witness has some

motive, bias, or interest in testifying against the defendant, and/or to challenge the integrity of the government's investigation.

### 1.    McKinney Affidavit

60. On May 21, 1997, 12 days after The Crime and 11 days after Majors' arrest, informant Kevin McKinney provided a detailed, three-page Affidavit that was witnessed by the Defendants Heider, Sapraicone and Calantjis ("McKinney Affidavit").  As memorialized in the Affidavit, McKinney told the Investigative Detectives that on May 17, 1997, his friend Bernard Johnson confessed to him that he committed The Crime together with Aaron Boone and a third perpetrator named "Rasheed"—not Majors. McKinney reported that Rasheed drove a "tanish" (sic) colored car.

61. Five days earlier on May 16, the Investigative Detectives interviewed a confidential informant who told them that "Country" was a co-leader of SpeedStick and drove a gold maxima car. "Country" was the nickname of "Rasheed", identified by McKinney as the third perpetrator.  McKinney told detectives that "Rasheed" aka "Country" drove "a tanish or goldish colored Maxima." *Infra* at ¶  67.

62. McKinney and Johnson were members of the SpeedStick gang that was commanded by Aaron Boone, his twin Ammon Boone and "Country." Aaron, like Bernard Johnson, was one of the three men who committed The Crime.  A confidential informant Emmanuel E. reported that SpeedStick was a violent gang that had

committed at least three murders, several brutal assaults and multiple armed robberies.

63. Johnson's confession to his confidante Kevin McKinney had overwhelming indicia of reliability. Johnson, who was not a police suspect when the statement was made, had no motive to falsely admit to his fellow gang member that he had committed a heinous crime. The McKinney Affidavit accurately identified as perpetrators Aaron Boone (nicknamed "Twin") as well as Johnson. Most significantly, the McKinney Affidavit described the planning and execution of the crime in detail and provided facts unknown to the public.

64. The McKinney Affidavit described the circumstances of Johnson's confession, the nature of The Crime and the way the perpetrators abandoned their getaway van when it sustained a flat tire, and then boarded a public bus to complete their escape. As set forth in the McKinney Affidavit (including typos):

> "Boone ran up to one of the cops that was on the ground and let him have it," "I said to Bernard (Bernard Johnson) what the hell is going on. Bernard said we pulled up in the van (Bernard & Twin) and twin (Aaron Boone) just got out of the van wilding blazing shit up (shooting). He also told me that twin had an AK 47 (assault rifle) and started shooting soon as they got out of the van he also said when twin started shooting Bernard followed suit (shooting too) Bernard also said that they were shooting at two cops and the twin ran up to one of the cops that was on the floor and let him have it (shot him up) then Bernard said that they took the money and took off in the van. He also told that Rasheed was in the back up car But doesn't say what Rasheed does at this Robbery. Bernard says van caught a flat tire and they see the OS busline and get on it. Twin & Bernard got off the bus by Parsons and Archer. Does not say where Rasheed went. Bernard said he left twin and went to work. Bernard says he got 40 thousand and that Aaron had about the same. He also said RA & the other twin (Ammon) also got

money. Bernard said that they robbed another armored car earlier that day in Queens and took 80 thousand dollars. Bernard said that RA (Rasheed) had left town."

65. The media reported that the perpetrators stole $50,000 when the actual amount, as Johnson accurately told McKinney, was approximately $80,000.

66. "The other twin," Ammon, was Ammon Boone, Aaron Boone's brother. As discussed *infra*, Ammon's fingerprints were found in the perpetrators' green Aerostar van. If disclosed to the defense, McKinney's statements concerning Ammon, as well as Rasheed, would have strengthened Majors' defense.

67. As memorialized in the Affidavit, McKinney told the detectives how he got to know Johnson, Boone, and Rasheed:

"I know Bernard aka Baretta from my cousin Poppy aka Edward Ward who grew up with Bernard in Pominox Houses. I know that Bernard works in a hospital in Jamaica Queens. I also know that Bernard has a son that about 10 months. Iv seen Bernard about 50 times since 1995 at least 5 of them times I seen him he was at the twins house (Aaron & Ammon) on Junction. I know Aaron through my cousin Edward Ward who introduce to Aaron about a year ½ ago. I met Ammon mabe 6 months after Aaron. Aaron is the one with the scare. Ive also been in the cars that twins drove (Suburban Landcruiser BMW) Ive (sic) also been down South with the twins in their club (Rondavu) in Blethwood, S.C.. Baretta & Rasheed have also been to the Rondavu Rasheed drive a tanish or goldish colored Maxima. I also met Rasheed at twin's house. Seen him maby 10 times my whole life. Rasheed also have a son who's two or three years of age. I also know that Rasheed Twins Bernard are all members of a group called (Speed Stick) which means robbery."

68. Heider, Sapraicone and Calantjis, giving full credence to the Affidavit, immediately went to Johnson's place of employment—the hospital in Jamaica, Queens where McKinney said Johnson worked—and arrested Johnson.

69. The Defendant detectives having decided to charge Majors and not having investigated Majors' alibi, did not take a single step to investigate the "Rasheed" lead provided by McKinney. Instead of keeping the case open to investigate Rasheed, the Investigative Detectives, being unalterably committed to charging Majors with The Crime, closed the case the next day, on May 22. As Det. Heider testified at a pretrial suppression hearing, "I closed this file out basically with the – I believe the investigation is over with basically with the arrest of Bernard Johnson after May 22nd."

70. The police closed the case not only before they could investigate Rasheed, but also before they could adequately investigate Aaron's brother Ammon. On May 21, 1997 Det. Alongis, examiner with the NYPD Latent Print Section, informed Lt. Nevin of the 109th Precinct that at least one fingerprint of Ammon Boone was found on a newspaper inside the Ford Aerostar van used in the robbery. App. IV (2) 621, 627, 649. During Det. Alongis' extensive direct testimony he failed to disclose that Ammon Boone's fingerprints were recovered at the crime scene. The prosecutor did not correct Det. Alongis' testimony that the only fingerprints recovered from the green van of value belonged to Aaron Boone. App. III 266:1-268:25.

71. The QCDAO, like the Investigative Detectives, gave full credence to McKinney. The QCDAO relied exclusively on the information McKinney provided to establish that

there was probable cause to arrest Johnson at the suppression hearing. As ADA
Evangelou stated, "With respect to Mr. Johnson the arrest of the defendant there was
probable cause based on the evidence by the individual [McKinney] named at the
hearing."

72. While the QCDAO and police represented that McKinney had implicated Johnson—
thus providing probable cause for Johnson's arrest—they did not disclose that
McKinney had signed an Affidavit implicating Johnson and exonerating Majors.

73. Judicial Hearing Officer Joan O'Dwyer sustained the arrest of Johnson, finding
McKinney to be a reliable "citizen informant."


### 2. The Desiree Stone DD5s and Statement Stone gave to Detectives

74. At approximately 10:30 a.m. on May 9, 1997, Desiree Stone got off the Q65 bus at
the intersection of 45th Ave and 162nd Street – the same stop at which the
perpetrators boarded the bus.

75. When she exited the bus, Ms. Stone saw the three perpetrators running and then
boarding the bus. She gave a statement memorialized in a police memo book, and
later a police DD5 #54 that the second person to board the bus wore "braids,
cornrows." Majors had short hair and had never worn his hair in cornrows.

76. Heider, Sapraicone, Calantjis and ADAs Evangelou and Eckhardt did not disclose the
Stone Statement during Majors' Bench or Jury trials.

77. Also suppressed by the Investigative Detectives and the prosecutors were the other
contents of DD5 #54 as well as DD5 #125. DD5 #54 reveals that two hours after the

robbery, Desiree Stone told investigative Detective Bovino that while exiting the rear door of the Q65 bus, she saw four people boarding the bus. Three of the four were running. One man had already crossed while the other two were running from across the street towards the bus. The DD5 #54 further discloses that Stone was taken to the 103 precinct Robbery Unit where she viewed photographs of "male blacks" with negative results. DD5 #125 recorded that the day following The Crime, Stone was taken to the NYPD robbery photo imaging Unit where she provided a description of the second to board the bus (supposedly Majors) as "male/black with cornrows/braids age 21-28, 5'10-6'2." Majors was 31, 5'7" had short hair, and no braids or cornrows.

78. On May 17, detectives interviewed a confidential informant, Thomas Emmanuel, who was also a SpeedStick gang member. One gang member who Emmanuel could not name but described fit the description provided by Stone: "m/b/22 approx. 6'1 inches and a stocky build, he has dreadlocks []."

79. At the jury trial the Hon. Stephen Fisher ordered the People to turn over any witness' description of the perpetrators who boarded the bus: "[I]f you have a description from people who are describing these individuals who got on the bus, if it's an exact match or not, turn it over." Despite the court's directive, ADAs Evangelou and Eckhardt both at the jury trial and later the bench trial withheld Stone's description of the second person to board the bus that did not match Majors. They withheld DD5s #54 and #125.

### 3. ADA Charles Testagrossa's Handwritten Notes

80. As memorialized in handwritten notes, on May 20, 1997, ADA Charles Testagrossa interviewed Detective Heider and received information that the description provided by Cherena for the artist rendering of the perpetrator fit the description of Kevin McKinney. Since Cherena later identified Boone as the driver of the van, this information could have been used to implicate McKinney and impeach the reliability of Cherena's identification of Majors.

81. The QCDAO suppressed the Testagrossa notes until March 2, 2021.

### D. The Fabricated Bernard Johnson "Confession" and the Forensic Evidence

82. Boone's, Johnson's and McKinney's fingerprints were submitted to the NYPD fingerprint analysis lab for comparison with the prints found in the abandoned green van. However, Majors' fingerprints were not. *Id.*

83. On May 21, 1997 Det. Alongis, examiner with the NYPD Latent Print Section, informed Lt. Nevin of the 109th Precinct that at least one fingerprint of Ammon Boone was found on a newspaper inside the Ford Aerostar van used in the robbery. During Det. Alongis' extensive direct testimony he failed to disclose that Ammon Boone's fingerprints were recovered at the crime scene. The prosecutor did not correct Det. Alongis' testimony that the only fingerprints recovered from the green van of value belonged to Aaron Boone.

84. Police obtained a warrant to search Boone's house and Johnson's locker at the hospital where he worked. Police did not request a warrant to search Majors' house for weapons or for the proceeds of the robbery.

85. After Johnson's arrest, Detectives Heider and Sapraicone and Lt. William Nevins interrogated Johnson at the 109th precinct. Johnson denied Majors was involved in The Crime. Defendants did not disclose to any QCDAO prosecutors—or to defense counsel—Johnson's statement denying Majors' involvement in The Crime.

86. Defendants Heider, Sapraicone and Nevins interrogated Johnson for approximately 30 hours in order to coerce a confession in which he would falsely implicate Majors, in addition to confessing his own culpability. During this interrogation, Defendants threatened Johnson and deprived him of sleep. At the conclusion of this unlawful interrogation, Johnson succumbed to the pressure and signed a false statement, fabricated by Defendants, stating that Majors participated in The Crime.

87. Defendants Heider, Sapraicone and Nevins forwarded Johnson's false confession to prosecutors, without disclosing that they had fabricated the confession. Had defense counsel known that Johnson had denied Majors' involvement in The Crime, or that Heider and Sapraicone had fabricated Johnson's confession, Majors would never have been convicted of attempted murder, robbery or possession of stolen property.

88. There were several inconsistencies with Johnson's "confession", which reflect its falsity. According to Johnson's confession, the perpetrators arrived at the scene 30 minutes early—i.e. at about 9:50 a.m.—to await the armored truck delivering the cash. This excluded Majors from participating in The Crime since, at 9:50, he was en

route to, or had just arrived at, his 10 a.m. chiropractor appointment, as confirmed by the testimony of his chiropractor, Dr. Carole Schuster. Whereas, according to Johnson's coerced confession, Boone planned the robbery, the trial evidence showed that Johnson was the mastermind and planned the robbery after receiving a tip from his girlfriend about the payroll delivery. Whereas, according to Johnson's coerced confession, he, Boone and Majors got out of the van at the scene, eyewitnesses and ballistic evidence showed that one of the three perpetrators remained in the getaway van, and only two got out.

89. At the Grand Jury, pretrial suppression hearing and at Johnson's separate trial, Detectives Sapraicone and Heider testified that Johnson had made a statement implicating himself, Boone and Majors. Johnson at the grand jury and at his trial disavowed his having made the statement. Even though Johnson's police "confession" was admitted at Johnson's separate trial, the jury acquitted him of attempted murder, presumably discrediting Heider and Sapraicone's account and accepting Johnson's defense that the statement was false and coerced after 30 hours of interrogation.

90. At Johnson's trial, prosecutors did not disclose the McKinney Affidavit or call McKinney to testify—because they knew McKinney's Affidavit and testimony would then be known to Majors' counsel and used to exculpate Majors at his separate trial.


### E. The QCDAO's Repeated Suppression of *Brady* Material Over 20 years

#### a. When Responding to Majors' Pretrial Omnibus Motion, ADA Testagrossa Suppressed The McKinney Affidavit, The Stone DD5s and His own Handwritten Notes

91. On July 25, 1997, Majors' counsel served an omnibus motion requesting *inter alia* "[a]ny written, recorded, or oral statement of the defendant, and of a co-defendant to be tried jointly, made . . . to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him (CPL § 240.10(1)(a))."

92. On August 7, 1997, ADA Charles Testagrossa submitted a response to the Motion acknowledging his "continuing obligation to provide *Brady* material should the same become known to us."

93. Despite this representation, Testagrossa failed to disclose to the defense, (a) The May 21, 1997 McKinney Affidavit that Majors did not participate in The Crime, (b) The two May 10, 1997 Stone DD5s that described the second perpetrator to board the bus which description did not match the physical characteristics of Majors and (c) Testagrossa's own May 20, 1997 handwritten notes indicating that Cherena had provided a description of the third perpetrator in the escape van that matched McKinney.

94. Testagrossa did produce Det. Heider's DD5 that recorded Johnson's police confession and named Majors as the third participant.

**b. At the Pretrial Suppression Hearing, ADA Evangelou Fails to Correct the Investigative Detectives' False Testimony, Thus Further Concealing the McKinney Affidavit.**

95. At the July 15, 1998 joint suppression hearing to determine in part whether there was probable cause to arrest Johnson, Det. Heider testified that McKinney had told him Johnson confessed to participating in The Crime. Heider referred to the information he received as a "conversation," thus concealing the handwritten McKinney Affidavit:

> Q.   And did you have occasion to get information either on that day or the next day – I'm sorry, the day before from an individual?
>
> A.   Yes: I had a *conversation* with a Kevin McKinney (phonetic).
>
> Q.   Now, the conversation you had with this Mr. McKinney, would you tell the Court in sum and substance what that *conversation* was?
>
> A.   He stated he had met with Bernard Johnson who is known to him as Baretta, on Roosevelt Avenue. I believe he stated was on the 17th, May 17th. And Bernard Johnson admitted to him or told him that he took part in that armor car robbery that took place on May 9th in Flushing.

96. ADA Evangelou, the trial prosecutor, in disregard of his duty to correct false testimony, failed to correct Heider's misleading testimony that McKinney imparted information to him only verbally, and not in writing.

97. Later in his testimony, Det. Heider again concealed the Affidavit which he was using to refresh his recollection as to the specific date of his "conversation" with McKinney.

98. Heider testified that, on May 21, 1997 (the date the affidavit was executed), he met with McKinney, who told him that, on May 17, 1997, Johnson had confessed to him. Given Det. Heider's knowledge of these exact dates 14 months later and the fact that he was looking down at a document as he testified, it was evident to defense counsel that he was refreshing his recollection using a written document. However, when

defense counsel asked Det. Heider, "what papers [he] is looking at," Det. Heider falsely testified, "I wasn't looking at any (sic) I was just moving papers around."

99. Since defense counsel may request the document a witness uses to refresh a recollection, Heider's false testimony that he was not looking at anything, also left uncorrected by Evangelou, prevented the defense from obtaining the McKinney Affidavit and learning of its potent exculpatory contents.

100. Det. Sapraicone also avoided disclosure of the Affidavit when testifying as to the source of his knowledge that Johnson worked at Mary Immaculate Hospital in Jamaica, Queens. This information came from McKinney and was memorialized in his Affidavit, which Det. Sapraicone witnessed before arresting Johnson at the Hospital. However, when asked how he learned where Johnson worked, Det. Sapraicone, furthering the collective effort to conceal the McKinney Affidavit, claimed he could not remember and did not mention the Affidavit.

101. Having been deceived by Evangelou, Heider and Sapraicone, Judge O'Dwyer concluded in her decision that detectives obtained information justifying Johnson's arrest through a "conversation" with McKinney.

### c. The QCDAO Concealed the McKinney Affidavit, Stone Notes and DD5s, and Testagrossa Notes for More Than 20 Years

102. As Judge Latella found in his May 18, 2020 decision, the McKinney Affidavit and Stone DD5s and notes were not disclosed to Majors or his trial attorneys, in violation

of *Brady* and Majors' Due Process Rights under the U.S. Constitution. The Testagrossa notes were not disclosed until after Latella's decision, on March 2, 2021.

103.　Following his convictions, Majors filed unsuccessful appeals to the Appellate Division, Second Department and New York Court of Appeals. Mr. Majors also filed two unsuccessful Federal *habeas corpus* petitions.

104.　The QCDAO appellate prosecutors had an ongoing duty to disclose any *Brady* material that QCDAO suppressed from Majors at trial.

105.　Yet the QCDAO continued to suppress the *Brady* material contained in the prosecutor's files during Majors' appeals and *habeas corpus* petitions.

106.　On June 12, 2007, Majors moved to vacate his judgment of conviction based in part on ineffective assistance of counsel for his trial counsel's failure to call Dr. Schuster at the bench trial. In opposing Majors' motion, the QCDAO again failed to disclose the suppressed *Brady* material. On September 24, 2007, Judge Latella denied Majors' motion without conducting a hearing.

107.　On January 22, 2010, Majors moved *pro se* to vacate his judgment of conviction based on ineffective assistance of trial counsel for his counsel's failure to investigate McKinney, who Majors believed possessed exculpatory information given his apparent knowledge of The Crime. On October 30, 2010, the motion was denied without a hearing in part because Majors had not met the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

108.　The McKinney Affidavit, Stone DD5s and Testagrossa's notes would have supported Majors' ineffective assistance of counsel claim for failure to investigate

McKinney, since an investigation would have led to a third party culpability defense.

Nevertheless, the QCDAO continued to suppress this *Brady* material.

109.   On February 28, 2013, Majors, to support a contemplated 440.10 motion based on a *Brady* violation, moved for the issuance of a subpoena *duces tecum* directing the production of any recorded statement by McKinney on constitutional grounds:

> "3.   In order to sustain petitioner's cause of action on post-conviction relief it would be necessary to obtain a copy of Kevin McKinney's statement given to Detective Paul Heider on May 21, 1997, within the confines of the 109th precinct, said statement identifies the three participants who committed the crime, which petitioner is incarcerated for, it implicates someone other than petitioner, and had this statement been disclosed during trial the outcome would have been different."
>
> 4.   The facts which the records being sought to be produced would show that the statement is relevant and exculpatory of guilt or innocence which was withheld by the Queens County District Attorney's Office, it names the real third participant involved, petitioners' name not being one of those involved, and such facts are essential to establish petitioner's claim on the merits of the action, because the People are obligated to disclose exculpatory evidence in their possession which is favorable to the petitioner and material to the issues of guilt or innocence, and there was a reasonable probability that had that material been disclosed to petitioner, the result would have been different, such as to undermine confidence in outcome of the trial."[4]

110.   Without addressing or denying Majors' constitutional claim that the QCDAO had to disclose McKinney's statement under *Brady*, the QCDAO opposed the 440.10 motion strictly on the statutory grounds that there is no right to post-conviction discovery.

---

[4] While Majors was aware McKinney had made a statement, and that any truthful statement would exculpate him, Majors did not know the form in which the statement had been recorded.

111.    The Court, unaware of the McKinney Affidavit containing *Brady* material, denied the request for the issuance of a subpoena on purely statutory discovery grounds.

112.    The government's suppression of the McKinney Affidavit and the Stone DD5s precluded Majors from filing his 440.10 motion for new trial based on *Brady* violations, delaying his exoneration by eight years.

113.    Even after conviction, the QCDAO had a continuing obligation to disclose *Brady* material that had been suppressed at trial.  Yet, the QCDAO continually suppressed the McKinney Affidavit, Stone DD5s and Testagrossa notes in the face of Majors' request for undisclosed *Brady* material.

114.    In the years following his conviction, Majors made a total of 10 requests to the QCDAO under the New York Freedom of Information Law ("FOIL"), Public Officers Law §§ 84-90, requesting *Brady* material, including any statements made by McKinney. Three of these FOIL requests centered on Majors' request for any statements by McKinney.

115.    Nevertheless, the QCDAO denied the production of the McKinney Affidavit.

116.    The QCDAO also opposed Majors' two Article 78 Petitions brought  pursuant to N.Y. CPLR 7801 *et seq.* appealing the denial of his FOIL request for the McKinney statement. Without alerting Majors or the court that McKinney's statement had been memorialized in an affidavit constituting *Brady* material, the QCDAO argued that any recorded statement by McKinney's was confidential since McKinney was a non-testifying witness. Based on the QCDAO's false, misleading arguments, Majors lost his Article 78 petitions.

117. The QCDAO disregarded its constitutional duty in failing to turn over the McKinney Affidavit, the Stone Statement and DD5s and the Testagrossa notes.

118. The QCDAO finally disclosed the McKinney Affidavit on June 3, 2018, after Majors obtained present counsel *pro bono*, who notified the QCDAO that FOIL required disclosure of McKinney's statement(s). The Stone DD5s were finally disclosed one year later, on June 4, 2019, when attached as an exhibit to QCDAO's opposition to Majors' N.Y. CPL § 440.10 motion to vacate his conviction. On March 2, 2021, the newly formed QCDAO Conviction Integrity turned over the Testagrossa handwritten notes.

**4. The QCDAO Misconduct Continues at the 2019-2020 CPL 440.10 Hearing**

119. On March 18, 2019 Majors filed a CPL § 440.10 motion based on *Brady* violations and prosecutorial misconduct. Attached to Majors' 440 motion were sworn affidavits from each of his trial defense attorneys who swore they never received the McKinney Affidavit.

120. The Hon John B. Latella granted a Hearing. Testimony was taken on November 19, 2019 and January 10, 2020.

121. QCDAO were represented by Executive Assistant District Attorney (EADA) Robert J. Masters and ADA Christopher Blira-Koessler. Despite the QCDAO's resistance to the disclosure of the McKinney Affidavit for over 20 years and despite its denial of 10 separate FOIL requests for the McKinney Statement and despite its opposition to two Article 78 Petitions, EADA Masters absurdly contended that the

McKinney Affidavit had been turned over to Majors' counsel at the time of the trials. The QCDAO took this brazen position even though there was no trial record of disclosure and all four defense attorneys—for Mr. Majors and for co-defendants Johnson and Boone—swore in affidavits and testimony that the McKinney Affidavit had not been disclosed to them.

122. The QCDAO's frivolous and plainly untenable position prolonged Majors' suffering for an additional 14 months, during which he remained incarcerated.

123. The QCDAO's baseless opposition to Majors' CPL § 440.10 motion and attempt to cover-up egregious *Brady* violations was consistent with its policy, practice, custom and culture of "winning at all costs," covering up misconduct and disregarding the constitutional rights of the accused.

124. At oral argument at the conclusion of the hearing, Judge Latella asked ADA Blira-Koessler whether he would acknowledge that the McKinney Affidavit constituted *Brady* material. ADA Blira-Koessler denied that the McKinney Affidavit identifying the third perpetrator as "Rasheed," not Majors, constituted *Brady*.

125. ADA Blira-Koessler's denial that the McKinney Affidavit constituted *Brady* is consistent with the QCDAO' longstanding policy, practice and custom of willfully ignoring *Brady* obligations and excusing *Brady* violations.

126. The QCDAO's efforts to block Mr. Majors' exoneration extended to its opposition to DNA testing on items recovered from the perpetrators' getaway van. The QCDAO opposed DNA testing, even though DNA test results could only help to uncover the truth. Ultimately, the Office of the City Medical Examiner (OCME) found sufficient

DNA to conduct testing on two pairs of gloves recovered from the getaway van. Majors' DNA was not found on either pair of gloves, nor was the DNA of Boone or of Johnson.

### 5. The Vacatur of Majors' Convictions and the Dismissal of Charges

127.   On May 18, 2020, Judge Latella issued his ruling vacating Majors' convictions for attempted murder, robbery and criminal possession of stolen property.

128.   Judge Latella in setting aside Majors' convictions held: "Mr. Majors has met his burden of showing by a preponderance of the evidence that the people failed to turn over various *Brady* material, and I am granting his motion to vacate the convictions arising out of the events of May the 9th 1997."

129.   Judge Latella further stated: "It strains credulity that had these documents [McKinney Affidavit and Stone statements and DD5s] been turned over to the defense their contents would not have been brought to the attention of the Court and raised as an issue with respect to the availability of Kevin McKinney and Desiree Stone or as to the admissibility of their content."

130.   With the vacatur of these convictions, Mr. Majors, who had been incarcerated for 22 years, was immediately eligible for parole on his 12 years-to-life sentence for weapons possession. Mr. Majors would have been eligible for parole 10 years earlier had he not been wrongfully convicted of attempted murder, robbery and criminal possession of stolen property.

131.    On August 26, 2020, Mr. Majors was granted parole at his first appearance before the parole board. Mr. Majors had an exemplary record in prison, where he received no disciplinary tickets, served as a peer mentor and successfully completed 49 programs aimed at becoming a better and more productive individual.

132.    Mr. Majors would have been granted parole and released from prison 10 years earlier had he not been wrongfully convicted for The Crime.

133.    Mr. Majors was released from prison on October 7, 2020.

134.    On October 20, 2020 the prosecution for The Crime terminated in Mr. Majors' favor when the indictment for the two counts of attempted murder and robbery, as well as criminal possession of stolen property, were dismissed with prejudice.

## CAUSES OF ACTION

### CLAIM I

**42 U.S.C. § 1983 and *Monell*. Municipal Liability for the conduct of prosecutors in the D.A.'s Office. Defendant City of New York**

135.    Plaintiff repeats and realleges each allegation in the preceding paragraphs of the complaint.

136.    ADAs Evangelou and Eckhardt were aware of the McKinney Affidavit but withheld it from Majors and his defense counsel at the jury and bench trials in violation of *Brady*.

137. ADAs Evangelou and Eckhardt were aware of the exculpatory statements by Desiree Stone, as memorialized in police notes and DD5s, but withheld it from Majors and his defense counsel at the jury and bench trials in violation of *Brady* as well as Judge Fisher's directive that any description of the perpetrators be disclosed.

138. ADAs Evangelou, Eckhardt and Testagrossa were also aware of and withheld from Majors and his counsel the Testagrossa notes showing that Cherena had provided a description of the third perpetrator in the van that matched McKinney, not Majors.

139. ADAs Evangelou and Eckhardt's withholding of crucial evidence exonerating Majors and pointing to an alternative perpetrator violated Plaintiff's rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

140. In addition to these violations, ADAs Evangelou and Eckhardt further infringed Plaintiff's constitutional rights to due process and a fair trial by using false and misleading testimony from detectives to suggest McKinney had related Bernard Johnson's confession through a "conversation" with detectives, as opposed to a sworn affidavit that also exonerated Majors.

141. For 18 years following Plaintiff Majors' unlawful conviction for attempted murder, robbery and criminal possession of stolen property, Evangelou, Eckhardt, Testagrossa and prosecutors in the QCDAO Appeals Bureau and FOIL Unit continued to suppress the McKinney Affidavit, the Stone statements and DD5s, and

the Testagrossa notes, despite Plaintiff's numerous efforts to obtain *Brady* material and, in particular, any statements by McKinney.

142. Individually and collectively, the violations by QCDAO prosecutors of Plaintiff's constitutional rights and their prolonging of Plaintiff's injuries were directly, foreseeably, proximately, and/or substantially chargeable to Defendant City of New York and resulted from deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation and prosecution by the D.A.'s Office.

143. Under the principles of municipal liability for federal civil rights violations, as well as New York State law, the District Attorney of Queens County, along with his authorized delegates, has final authority and is the City's policymaker in setting officewide policies, practices and customs concerning the prosecution of criminal matters and in training, instructing, supervising and disciplining assistant district attorneys regarding their conduct in criminal matters, including but not limited to their constitutional obligation to timely and full disclose material evidence and information favorable to the defense as set forth in *Brady* and its progeny. *See Bellamy v. City of New York et al.,* 914 F.3d 727 (2d Cir. 2019).

144. The District Attorney of Queens County, Richard Brown, and his successor John Ryan, personally and/or through their authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

145. In the years before, during and after Mr. Majors' 2001 conviction, the QCDAO, under D.A. Brown, who served as District Attorney from 1991 to 2019, and his

predecessor, John Santucci, had an extensive history of prosecutorial misconduct that caused constitutional violations, including, *inter alia*, *Brady* violations, knowing reliance on false testimony and argument and the failure to correct the same, and improper closing arguments.

146.    In the years before, during and after Mr. Majors' 2001 conviction, the Queens D.A. and his authorized delegates maintained deliberate or *de facto* policies, procedures and/or customs that caused these constitutional violations, including a policy, custom, or practice of deliberate indifference to past violations by QCDAO employees of these constitutional obligations, to the risk of future such violations by QCDAO employees, and to the obvious need to train, supervise and discipline QCDAO employees with respect to these obligations.

147.    From 1985 through 2019, the Queens County District Attorney employed and condoned a series of no holds-barred, anything goes, scorched earth, policies, practices and/or customs. The policies were aimed at winning convictions or resisting CPL 440.10 motions at any cost, including by suppressing exculpatory evidence and using false testimony, making misleading and inflammatory argument and disregarding the constitutional rights of the accused.

148.    Further contributing to the anything-goes atmosphere was the knowledge among prosecutors that the D.A.'s Office would not discipline them for misconduct and would reward them for any conduct that helped to "win" convictions. In some cases, the QCDAO even attacked judges who made unfavorable decisions citing prosecutorial misconduct.

149.   A QCDAO culture, where winning mattered more than following the Constitution, was a proximate cause of ADA Evangelou's, Eckhardt's and Testagrossa's constitutional violations set forth, *supra*. It also was the proximate cause of the continued suppression of *Brady* material by prosecutors in the QCDAO appeals bureau and FOIL units after Majors' conviction, as well as the efforts by EADA Masters and ADA Blira-Koessler to deny and excuse the QCDAO's *Brady* misconduct during post-conviction proceedings in 2019-2020, set forth *supra*.

150.   During the entirety of D.A. Brown's time in office, including the time of Majors' arrest, prosecution, and conviction, D.A. Brown and his authorized delegates maintained deliberate or *de facto* office-wide policies, customs, and/or practices, including the failure to discipline prosecutorial misconduct, that evinced deliberate indifference to the constitutional rights of defendants who were investigated, arrested, or prosecuted for alleged criminal activity, including:

   a.   The suppression of material favorable evidence constituting *Brady* material;

   b.   The active and fraudulent concealment of favorable evidence;

   c.   The failure to correct false testimony;

   d.   The use of false and misleading argument to judges and juries.

151.   The unconstitutional policies identified above in ¶ 150 were followed by Testagrossa, Evangelou, Eckhardt, Masters and Blira-Koessler, were applied in Majors' case, and directly caused or prolonged Majors' constitutional injuries. The misconduct by Testagrossa, Evangelou, Eckhardt, Masters and Blira-Koessler was

also directly caused by their knowledge that they would not be disciplined for *Brady* violations or other misconduct that deprived Majors of his constitutional rights.

152.    The leadership of the D.A.'s Office knew that even a single instance of prosecutorial misconduct, if it led to no discipline, could poison the atmosphere of the entire office, as former Acting District Attorney John Ryan acknowledged in a sworn deposition in 2020.[5]

153.    Yet, from 1991 through 2019 the Queens District Attorney's Office did not discipline a single prosecutor for misconduct—with the sole exception of Prosecutor S,[6] whose notorious misconduct was excused for years before it finally led to bad publicity and the three-year suspension of Prosecutor S's law license. Prosecutor S was only disciplined—belatedly, in 2002—after he was caught red-handed lying to a judge in a 2002 incident that generated significant publicity and embarrassment for the QCDAO. Previously, Prosecutor S had been promoted, and not disciplined, despite multiple court findings that he had committed egregious misconduct warranting the vacatur of major convictions.

154.    For example, in *People v. Walters*, 674 N.Y.S.2d 114 (2d Dep't 1998), a conviction obtained by Prosecutor S was reversed because at trial Prosecutor S had argued in summation that the defendant had committed a shooting with a gun

---

[5] Acting D.A. Ryan succeeded D.A. Brown on May 4, 2019 and served as Acting D.A. until December 31, 2019.

[6] While the misconduct of Prosecutor S has been publicized, Plaintiff omits his name from the complaint, in an abundance of caution, to preserve confidentiality.

recovered from him which Prosecutor S *knew* had not been used in the crime. The appellate court reversed the conviction, finding Prosecutor S's conduct to be "an abrogation of his responsibility as a prosecutor," "egregious," and "improper." *Id*. at 116. In *Farakesh v. Artuz*, No. 99 Civ. 3945, 2000 WL 1480896, at *9-11 (E.D.N.Y. Oct. 3, 2000)), U.S. District Judge John Gleeson granted federal *habeas corpus* relief where there was "no doubt that the prosecutor [Prosecutor S] committed multiple violations of [the] rule" prohibiting prosecutors from attempting to impeach a defendant with his post-*Miranda* silence. *Id*. at *10. Judge Gleeson found that Prosecutor S had committed "repeated, flagrant violations." *Id*. at *9, 10. In 1999 Prosecutor S obtained a conviction in *People v. Jamal*, reversed in 2003. 307 A.D. 2d 267 (2d Dep't 2003). In 2001, Prosecutor S. tried *People v. McCall*, which was subsequently reversed. 5 A.D. 3d 608 (2d Dep't 2004).

### A. The QCDAO Prosecutorial Misconduct Survey

155.    In early 1996, the executive leadership of the QCDAO compiled a Prosecutorial Misconduct Survey (the "Survey") that demonstrated its awareness of the rampant misconduct by its prosecutors..

156.    As the City confirmed in a Fed. R. Civ. P. 30(b)(6) deposition on December 1, 2020, the Survey found that, in at least 39 cases between 1988 and 1996, either an

appellate court held that the QCDAO committed misconduct (22 cases), or the QCDAO admitted misconduct absent such a finding (17 cases).[7]

157.    The QCDAO's prosecutorial misconduct in the Survey included all of the above types of prosecutorial misconduct resulting in constitutional violations, including *Brady* and related discovery violations, summation misconduct, improper cross-examination, failure to correct false testimony and improper reliance on false or inadmissible evidence.

158.    The instances of misconduct covered by the Survey constituted just a fraction of the total instances of misconduct the QCDAO had committed between 1988 and 1996, and also did not include numerous additional incidents prior to 1988.

159.    Nevertheless, the 1996 Survey revealed rampant prosecutorial misconduct, including in the following cases, which represent a sample of the misconduct found in the Survey:

1.  *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992), ordering a new trial where the QCDAO prosecutor's summation "went well beyond the bounds of fair advocacy," including suggesting that defendant's alibi was concocted after the witness met with defense counsel.

2.  *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993), reversing a defendant's manslaughter conviction where the QCDAO made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a QCDAO supervisor would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement.

---

[7] Depositions referred to were taken in the civil litigation of *Bellamy v. City of New York*, 2012 CV 1025 (AMD) (PK), in which present counsel represented the plaintiff, Kareem Bellamy.

3. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994), reversing a conviction where the QCDAO withheld potential impeachment material, suggested without evidence that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic, comments that "went beyond the permissible bounds of broad rhetorical comment and should not be repeated at a new trial."

4. *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994), reversing a conviction in part based on QCDAO summation misconduct and reliance on unduly prejudicial evidence.

5. *People v. Montesa*, 211 A.D.2d 648 (2d Dep't 1995), reversing a conviction in part because the QCDAO prosecutor elicited hearsay testimony from a witness and committed summation misconduct.

6. *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995), reversing a conviction where a QCDAO prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

7. *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995), ordering a new trial where the QCDAO's misconduct was "so flagrant and so pervasive that it was impossible for the defendant to receive a fair trial," including repeatedly referring to defendant as a convicted felon to convict him based on criminal propensity, and attempting to shift the burden of proof.

8. *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995), reversing a conviction in part based on the QCDAO prosecutor's disregard of the court's ruling limiting unfairly prejudicial evidence, cross–examination questions comparing defendant to Hannibal Lecter in Silence of the Lambs, and waving of a knife in front of the jury during summation.

9. *People v. Leuthner,* 216 A.D.2d 327 (2d Dep't 1995), reversing a conviction due to serial misconduct by the QCDAO prosecutor.

10. *People v. James*, 218 A.D.2d 709 (2d Dep't 1995), noting "unacceptable practices engaged in by the [QCDAO] prosecutor."

160. As the City admitted in a December 1, 2020 Fed. R. Civ. P. 30(b)(6) deposition in *Bellamy v. City of New York et al.,* 12-cv-1025 (AMD)(PK), in response to the Survey, the QCDAO:

    a. Failed to change any QCDAO policy;

    b. Failed to change any QCDAO practice;

    c. Failed to change any QCDAO procedure;

    d. Failed to discipline any QCDAO prosecutor;

    e. Failed to change its disciplinary process for QCDAO prosecutors (in fact, there was no process);

    f. Failed to identify which prosecutors committed the misconduct in the Survey;

    g. Failed to incorporate prosecutorial misconduct, including but not limited to court findings of prosecutorial misconduct, into employment evaluations of QCDAO prosecutors;

    h. Failed to make any changes to the way prosecutors were evaluated;

    i. Failed to make any changes to the way prosecutors were supervised;

    j. Failed to create additional oversight by Brown, then Chief Assistant DA Barry Schwartz, Chief of Appeals Steven Chananie, Chief Assistant John Ryan or any executive in the QCDAO;

    k. Failed to change any hiring practices for QCDAO prosecutors;

    l. Failed even to inform trial QCDAO prosecutors about the results of the Survey;

    m. Failed to inform appellate QCDAO prosecutors about the results of the Survey;

n. Failed to have any office-wide meeting to discuss the Survey or response to the Survey;

o. Failed to track QCDAO prosecutorial misconduct post-Survey;

p. Failed to analyze QCDAO prosecutorial misconduct, by type, by prosecutor, or by any other method; and

q. Failed to do any follow-up prosecutorial misconduct survey.

161. For his part, District Attorney Brown, who received the Survey, took no action at all in response to the Survey.

162. At the time the survey was compiled, then Chief Assistant District Attorney Barry Schwartz was the QCDAO's second-in-command from 1991-1997 and was delegated responsibility for, *inter alia*, discipline, promotions, and other supervision and personnel matters.

163. Schwartz testified at a deposition in *Bellamy v. City of New York*, on November 13, 2020, that he has no memory of the QCDAO "taking any kind of action in response" to the Survey.

164. Nothing in the Survey surprised or could have surprised the QCDAO's leadership. D.A. Brown was a Justice of the Appellate Division, Second Department from 1981 to 1991, during which time he heard numerous appeals of Queens County criminal convictions and became aware of the QCDAO's pervasive prosecutorial misconduct. Nevertheless, he did not take steps to rein in such pervasive misconduct when he became District Attorney in 1991 or in the years preceding or following Majors' 2001 conviction.

165.   From the beginning of his tenure in 1991, D.A. Brown routinely read appellate

decisions in QCDAO cases. Chief ADA Schwartz also routinely read those cases, and

read QCDAO reversal memos that summarized the disposition and reasoning of those

cases. Those cases formed the basis for the results of the Survey.

166.   As Mr. Schwartz testified:

Q:     [W]ere you aware [in] 1991, '92, '93, '94, '95 and '96, of all of
these opinions from appellate courts finding misconduct in the QDA?

A:     I read advance sheets, I read slip opinions where they said we had
committed prosecutorial misconduct, a word or phrase that I do not
embrace, yes, I was aware of it.

167.   Throughout his tenure, from 1991 through the Majors trial and after, D.A. Brown

and his authorized delegates, including Chief ADA Schwartz and Chief ADA Ryan,

knew about prosecutorial misconduct by QCDAO prosecutors.

168.   D.A. Brown and Chief ADA Schwartz purportedly "expressed concern" to each

other "about reversals that characterized the trial assistant engaging in what the courts

like to call 'prosecutorial misconduct.'"

169.   Yet neither took any action, much less sufficient action, to address, prevent, or

punish prosecutorial misconduct in the QCDAO.


**B.  Additional Misconduct not included in Survey**

170.   As damning as the Survey was, it contained a woefully incomplete summary of

QCDAO prosecutorial misconduct in the early and mid 1990s. A number of

prosecutors apparently failed to respond to the Survey, and the Survey missed recent misconduct of a number of prosecutors who had recently left the QCDAO.

171. As a result, at least 19 decisions (almost all appellate cases) not reflected in the survey found additional prosecutorial misconduct by the QCDAO between 1991 and 1995.

172. The QCDAO, including D.A. Brown and Chief ADA Schwartz, read and knew about these decisions, all of which were filed and available to the general public.

173. The additional misconduct cited in these decisions was wide ranging, including violations of *Brady* and *Rosario*,[8] improper cross-examination, violation of court orders, summation misconduct, failure to correct false testimony, improperly eliciting evidence at trial, and improper coaching of People's witness at trial.

174. The unlawful policies, procedures, regulations, practices and/or customs of the Defendant City in withholding evidence favoring criminal defendants, in presenting false, misleading or improper evidence, testimony or argument at criminal trials, and in condoning, covering up, ratifying and failing to discipline such misconduct, is exemplified by an extraordinary history of appellate decisions reversing criminal convictions obtained by the Queens District Attorney's Office under former District Attorneys John Santucci and Richard Brown.

---

[8] Under *People v. Rosario*, 9 N.Y.2d 286 (1961), codified in New York Criminal Procedure Law Section 240.45, prosecutors must disclose to the defense each prosecution witnesses' prior recorded statements, so long as they are material to that witness' testimony.

**C. 106 published decisions between 1985 and 2017 reversed Queens convictions because of *Brady* violations, prosecutors' knowing use of false or misleading evidence, improper summation remarks, and other misconduct**

175. Exhibit A lists 106 instances of published court decisions between 1985 and 2017 reversing Queens convictions because of misconduct by Queens prosecutors, including numerous *Brady* violations.

176. With the exception of Prosecutor S, no disciplinary action was taken against any of the prosecutors in these 106 cases involving reversals for constitutional violations.

**D. QCDAO failed to discipline prosecutors or to take any corrective action in the face of rampant prosecutorial misconduct in the years prior to Majors' prosecution and conviction**

177. In response to the rampant prosecutorial misconduct the QCDAO:

    i.  Failed to change any QCDAO policy;

    ii.  Failed to change any QCDAO practice;

    iii.  Failed to change any QCDAO procedure;

    iv.  Failed to discipline any QCDAO prosecutor; and

    v.  Failed to implement any new training.

178. Notwithstanding rampant, wide-ranging prosecutorial misconduct in the QCDAO, from at least June 1991 through January 1997 (Barry Schwartz's tenure as Chief Assistant), and continuing from January 1997 through 2019 (John Ryan's tenure as Chief Assistant and Acting DA), the QCDAO:

a. Failed to discipline a single QCDAO prosecutor for prosecutorial misconduct—with the exception of Prosecutor S.

b. Failed to create a handbook or manual setting forth rules and procedures for prosecutors, including how to comply with their constitutional obligations;

c. Had "no procedure in place" for "investigating prosecutorial misconduct of any type";

d. Failed to note prosecutorial misconduct in an employment evaluation;

e. Failed to have any practice or procedure to note prosecutorial misconduct in a personnel file;

f. Had no policy, practice, or procedure to use reversal memos as part of employment evaluations;

g. Failed to create any practice, policy or procedure to ensure that supervisors were aware of findings of prosecutorial impropriety;

h. Failed to create any practice, policy or procedure to make Schwartz or Brown (or Ryan) aware of misconduct by prosecutors before promoting them or increasing their compensation;

i. Failed to include reversal memos, appellate decisions, or any document that might reflect prosecutorial misconduct in the packets compiled before Schwartz recommended a promotion;

j. Failed to keep records of findings of misconduct by individual prosecutor, by bureau, or by the Office as a whole;

k.  Failed to conduct any review of QCDAO prosecutorial misconduct before February 1996; and

l.  Failed to do any trend analysis of prosecutorial misconduct over time.

179.    Despite courts repeatedly assailing the QCDAO for dozens of instances of prosecutorial misconduct that occurred before Mr. Majors' trial and conviction, there was no adverse consequence to the prosecutors who were responsible and no change in office policy, practice or procedure to prevent still more such occurrences in the future.

180.    This misconduct included *Rosario* violations, *Brady* violations, suborning false testimony, and improper opening and closing statements.

181.    Some examples illustrate how the QCDAO created an office culture where prosecutorial misconduct was ignored, condoned, and rewarded.

**Prosecutor A[9]**

182.    In 1990, QCDAO Prosecutor A prosecuted Robin Tellier in *People v. Tellier*, Ind. 2591/90. Prosecutor A (i) failed to disclose *Rosario* material; (ii) failed to disclose *Giglio* material; (iii) misrepresented to defense counsel that all *Brady* and *Rosario* material had been disclosed; (iv) lied to the court about whether federal prosecutors were observing a witness's trial testimony as part of a potential cooperation agreement; and (v) allowed a People's witness to claim a loss of memory concerning

---

[9] Prosecutors are not identified in light of a confidentiality agreement in *Bellamy v. City of New York*, 2012-cv-1025 (AMD)(PK).

prior crimes, when information concerning those crimes was contained in notes Prosecutor A had withheld from defense counsel.

183.    The Grievance Committee for the Ninth Judicial District later admonished Prosecutor A for concealing the notes, for a "misrepresentation" to the court, and for engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

184.    On October 1, 1991, the QCDAO nevertheless gave Prosecutor A an "Excellent" evaluation, noting: "This Assistant likes to win and fights towards that end."

185.    On May 1, 1992, the QCDAO gave Prosecutor A a "Very Good" evaluation, stating that Prosecutor A "is a true warrior in that he never backs down or is intimidated."

186.    Neither evaluation mentioned the *Tellier* case or Prosecutor A's unethical and unlawful conduct in that case.

187.    On March 29, 1993, the Second Department found in *People v. Kane*, 191 A.D.2d 711 (2d Dept. 1993) that Prosecutor A improperly in opening and closing arguments "impl[ied] the defendant's guilt of an unrelated burglary."

188.    On September 1, 1993, the QCDAO's Daniel Saunders gave Prosecutor A an "Outstanding" evaluation, noting that Prosecutor A "acquitted himself well with every assignment he's undertaken" and that "[h]is judgment, temperament and advocacy skills are all outstanding."

189.    Saunders was then the Chief of Homicide Trials at the QCDAO.

190.    Saunders' 1993 evaluation failed to mention the *Tellier* or the *Kane* case, or Prosecutor A's improper conduct in either case.

191.    On February 2, 1995, the Queens Supreme Court granted a motion to vacate a conviction in a decision later affirmed by the Second Department. *People v. Moustakis*, 226 A.D.2d 401, 640 (1996). Prosecutor A prosecuted that case. The court found that Prosecutor A "fail[ed] to turn over 16 pages of notes of detailed admissions by a prosecution witness concerning his prior criminal history," details of which the witness "forgot" on the stand.

192.    On August 28, 1995, a few months after the first *Moustakis* decision, Schwartz announced in a memo to "the Entire Staff" Prosecutor A's promotion to Deputy Bureau Chief of the Supreme Court Long Island City Bureau. There, Prosecutor A supervised 10-11 prosecutors.

193.    Per his regular practice at the QCDAO, Schwartz promoted Prosecutor A "in consultation with the district attorney," Mr. Brown.

194.    About two weeks later, on September 15, 1995, in a decision following a March 31, 1995 argument, the Second Department reversed the conviction in *People v. Spinelli*, 214 A.D.2d 135(2 Dept. 1995). Prosecutor A prosecuted Spinelli. The Court found that Prosecutor A improperly cross-examined an officer about the defendant's pretrial silence, engaged in summation misconduct, and held that "the prosecutor's conduct was fundamentally unfair."

195.    This decision also had no effect on Prosecutor A's promotion or other adverse effect on Prosecutor A's career at the QCDAO.

**Prosecutor B**

196.    On December 13, 1993, Brown promoted QCDAO Prosecutor B to Deputy Chief of the Supreme Court/Kew Gardens Bureau.

197.    On August 22, 1994, the Second Department reversed the conviction in *People v. Elder*, 207 A.D.2d 498(2 Dept. 1994). Prosecutor B prosecuted Elder. The Court found that Prosecutor B engaged in "flagrant" "instances of prosecutorial misconduct," in particular, summation misconduct, which "substantially prejudiced defendant's case."

198.    Notwithstanding Prosecutor B's flagrant misconduct, Prosecutor B did not receive any discipline, any adverse consequence, or any new training.

199.    As Schwartz put it, "[n]othing changed as a result of the decision of this case."

200.    To the contrary, on April 27, 1995, Schwartz announced in a memo to "the Entire Staff" Prosecutor B's promotion to Chief of the Intake Bureau.

201.    There, Prosecutor B supervised intake for the entire QCDAO.

**Prosecutor C**

202.    On September 26 1994, the Second Department held in *People v. Fanfan*, 207 A.D.2d 907 (2d Dept. 1994) that the QCDAO "exceeded the bounds of a proper summation." Prosecutor C prosecuted Fanfan.

203.    On May 15, 1995, the Second Department reversed the conviction in *People v. Moss*, 215 A.D.2d 594 (1995). Prosecutor C prosecuted Moss. The court found that Prosecutor C improperly (i) compared the defendant to Hannibal Lecter in the film *Silence of the Lambs* during cross-examination of the defendant; (ii) asked the jury in summation to "place themselves in the position of victims being threatened by the

defendant"; (iii) disregarded the court's *Sandoval* ruling excluding evidence; and (iv) improperly waved a knife during summation.

204.    Surely a prosecutor like this would be disciplined, if not terminated, in any district attorney's office seeking to address prosecutorial misconduct. Not the QCDAO. On August 25, 1996, Schwartz announced in a memo to "the Entire Staff" Prosecutor C's promotion to Supervisor of the Training Bureau.

205.    There, fresh off comparing a defendant to Hannibal Lecter and waving a knife in front of the jury, Prosecutor D taught QCDAO prosecutors how to prepare and try cases.

206.    Prosecutor C himself received no discipline or further training as a result of his misconduct in the *Fanfan* or *Moss* cases.

### Prosecutor D

207.    On June 10, 1991, the Second Department reversed the conviction in *People v. Stevens*, 174 A.D.2d 640 (2d Dept. 1991). Prosecutor D prosecuted Stevens.  The court found that Prosecutor D improperly stated in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that an act of sodomy had occurred.

208.    In July 1991, Chief of Training Andrew Zwerling and Schwartz made Prosecutor D a co-supervisor of the new QCDAO Training Bureau. There, she trained prosecutors in all aspects of trial practice.

209. On August 31, 1992, the Second Department reversed the conviction in *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992). Prosecutor D prosecuted Clausell. The Court found that Prosecutor D (i) failed to produce *Brady* material; (ii) before opening statements, misrepresented to the trial court and to defense counsel that the *Brady* material did not exist; (iii) after an officer's testimony, again mispresented to the trial court that the *Brady* material did not exist; and (iv) again failed to produce the *Brady* material.

210. The defense then subpoenaed the material from the police department and received it, nine days after the conviction.

211. After Prosecutor D's serial misconduct in *Clausell*, and notwithstanding that Prosecutor D was a supervisor in the Training Bureau, the QCDAO did not discipline her, give her any additional training, place a note in her evaluation or personnel file, or apparently take any other action.

212. To the contrary, the QCDAO gave Prosecutor D twelve salary increases, three bonuses, and in 1997 promoted her, again, to become Chief of the Training Bureau.

**Prosecutor E**

213. On February 29, 1988, the Second Department reversed the conviction in *People v. Romain*, 137 A.D.2d 848 (2d Dept. 1988). Prosecutor E prosecuted Romain. The Court found that Prosecutor E engaged in "gross distortion" in summation, "the magnitude of which was highly prejudicial."

214. In May 1994, in the case of *People v. Moore*, 206 A.D.2d 391(2d Dep't 1994), at trial Prosecutor L questioned several witnesses about prohibited evidence (concerning

defendant's pending and other prior criminal cases), then compounded the misconduct by repeating the prohibited evidence in closing arguments.

215.    Nevertheless, after this memo, the QCDAO gave Prosecutor E five salary increases, one bonus, and a promotion to Intake Supervisor. Prosecutor E did not receive any discipline or reprimand for her misconduct in the *Romain* and *Moore* cases.

216.    Prosecutors A, B, C, D and E are merely a few examples of QCDAO prosecutors who violated criminal defendants' constitutional right to due process and a fair trial in the years leading up to Mr. Majors' conviction and immediately following it, faced no adverse action, received no further training or supervision, and continued to thrive and progress in the office.


### E.  ADA Testagrossa and the QCDAO's *Brady* suppression in three wrongful convictions related to Majors' case

217.    In light of the City's policy of never disciplining for prosecutorial misconduct, Testagrossa, Evangelou and Eckhardt, having no fear that their conduct would have consequences, blatantly engaged in egregious misconduct that caused Majors' to be deprived of his Fair Trial Rights and wrongfully convicted of The Crime.

218.    A recent example of Testagrossa's misconduct, caused by his belief that the QCDAO cared only about "winning" and would not discipline misconduct, are the cases of George Bell, Gary Johnson and Rohan Bolt, who Testagrossa caused to serve 25 years in prison for a double homicide they did not commit.

219.    Bell, Johnson and Bolt were prosecuted and convicted for the December 24, 1997, double homicide of Ira Epstein and off-duty New York City police detective Charles Davis, both of whom were killed as Epstein opened up his check-cashing business on Astoria Boulevard in Queens, New York. Bell, Johnson and Bolt were arrested shortly after the crime and ultimately each were sentenced to 50 years-to-life in prison. Bell was additionally charged with capital murder and faced the death penalty.

220.    ADA Testagrossa, together with ADA Brad Leventhal, were the trial prosecutors of all three defendants.

221.    Five months after the three defendants were arrested, but before the trials, ADA Testagrossa interviewed a New York Police Department detective who told him that a local robbery crew called the "SpeedStick" gang may have been responsible for the Epstein and Davis' murders.

222.    ADA Testagrossa prepared seven pages of handwritten notes recording SpeedStick's possible involvement in the Davis and Epstein double homicide.

223.    ADA Testagrossa separately knew of two DD5 police reports, numbered 288 and 291, memorializing credible evidence, including statements from a SpeedStick gang member, stating that the SpeedStick gang committed the Davis and Epstein murders.

224.    Yet fearing no consequence, and intent on winning the convictions at all costs, ADAs Testagrossa and Leventhal suppressed all of this information from Bell, Bolt, Johnson and their attorneys.

225.    Further, in response to the defense counsel's specific request for any information connecting the SpeedStick gang (who had been discussed in a local newspaper article)

to the murders, ADAs Testagrossa and Leventhal falsely represented to Bell, his attorney, and the presiding judge that Speedstick had no involvement in the Davis and Epstein murders, and they vigorously opposed disclosure of police reports relating to the Speedstick gang.

226. The court, accepting Testagrossa's and Leventhal's representations that the defense request was a "fishing expedition," denied the application.

227. Nearly 20 years later, during post-conviction proceedings concerning Mr. Majors' wrongful conviction of a crime committed by Speedstick members (Boone, Johnson and, most likely, "Rasheed", McKinney or Ammon Boone), the QCDAO disclosed DD5s 288 and 291 relating to the SpeedStick gang's commission of the Epstein and Davis murders. Mr. Majors' present counsel was by happenstance assisting *pro bono* attorneys at Wachtell, Lipton, Rosen & Katz with the exonerations of Bell, Bolt, and Johnson and realized the connection to the Davis/Epstein homicide. As a result, Majors' present counsel shared DD5s 288 and 291 with the attorneys for Bell, Bolt and Johnson, who had no connection to the Speedstick gang.

228. The Queens District Attorney's newly formed Conviction Integrity Unit later disclosed Testagrossa's handwritten notes and additional *Brady* material which ADAs Testagrossa and Leventhal had suppressed for over 25 years.

229. Based on this evidence, on March 5, 2021 Queens Supreme Court Justice Joseph Zayas vacated the convictions of Messrs. Bell, Johnson and Bolt and they were released from prison. On June 2, 2021 the indictments against them were dismissed with prejudice and their arrests sealed.

230.    In vacating the convictions, Judge Zayas found that Testagrossa together with

other QCDAO executives "deliberately withheld " *Brady* material, repeatedly made

false, sworn representations to the Court, and "completely abdicated [their] truth-

seeking role."

231.    On March 11, 2021, four days after Judge Zayas' decision, Testagrossa who at the

time was Chief of Investigations at the Nassau County District Attorney's Office, was

forced to resign.

232.    Shortly thereafter, Testagrossa's co-prosecutor Brad Leventhal was forced to

resign from his position under the new Queens District Attorney, Melinda Katz.


**F.  In 1998, D.A. Brown writes to Chief Assistant Ryan acknowledging systemic misconduct by Queens prosecutors: "we've been getting away with this stuff for a long time."**

233.    During civil discovery in *Bellamy v. City of New York et al.,* 12-cv-1025 (AMD)

(PK), the City disclosed an undated 1998 handwritten note from D.A. Brown to Chief

Assistant Ryan.

234.    This note was attached to the Appellate Division decision in *People v. Walters*,

251 A.D.2d 433, (2d Dept. 1998), which characterized trial  Prosecutor S's

suppression of *Brady* material and his intentional use of misleading arguments as

"egregious," "improper" and "an abrogation of his [Prosecutor S.  responsibility as a

prosecutor." D.A. Brown wrote to Chief ADA John Ryan:

> "John – Let's discuss how to handle – **I think we've been getting away**
>
> **with this kind of stuff for a long time."** (emphasis added)

235.    Despite D.A. Brown's recognition that QCDAO prosecutors had been "getting

away with this kind of stuff for a long time," the QCDAO's policy of not disciplining

for prosecutorial misconduct did not change.

236.    In fact, shortly after D.A. Brown wrote his note to Chief ADA Ryan, Prosecutor S.

received substantial raises, a major promotion, and laudatory evaluations. In the

*Bellamy* civil litigation, Mr. Ryan testified that he and also D.A. Brown personally

approved all raises and promotions, while Mr. Ryan reviewed all personnel

evaluations. As noted, Prosecutor S. went on to commit additional misconduct that

resulted in the reversal of major convictions.


### G. QCDAO policies, practices and/or customs caused prosecutors to conceal *Brady* material from Majors in order to "win" a conviction

237.    In sum, policymakers at the QCDAO, acting with deliberate indifference to

constitutional violations generally, including *Brady* violations, failed to take any steps

to protect against constitutional harm certain to occur without policies, practices, or

procedures in place to prevent, address, or punish prosecutorial misconduct.

238.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices

and/or customs, including the failure to properly instruct, train, supervise, and/or

discipline employees with regard to *Brady* violations, were implemented or tolerated

by policymaking officials for Defendant City, including, but not limited to, the D.A.

and his delegates, who knew:

a. to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c. that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office places on prosecutors to win convictions at any cost;

d. that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

e. that employees of the D.A.'s Office had a history of making wrong choices in such matters.

239. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

a. numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A, which is incorporated herein by reference), that Queens County ADAs had:

i. failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York; and

ii. presented or failed to correct false or misleading testimony and

argument; and

iii. made arguments at trial that were so false, misleading, or otherwise

improper that they deprived the defendant of due process and a fair

trial; and

b. the inherent obviousness of the need to train, supervise, and/or discipline

ADAs with respect to the aforementioned constitutional obligations to

counteract the pressure that the D.A.'s Office applied to prosecutors to

obtain convictions.

240. During all times material to this complaint, the City, through its policymaker, the

D.A., owed a duty to the public at large and to Plaintiff to implement policies,

procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by

subordinates that violate the constitutional rights of criminal suspects or defendants

and of other members of the public.

241. However, the D.A. and his designees, as policymakers for the City, knowingly and

intentionally breached, or were deliberately indifferent to, this duty.

242. The QCDAO's policy, practice, and procedure of allowing prosecutors to commit

prosecutorial misconduct in dozens of cases, without consequence, made it

foreseeable to QCDAO policymakers, and therefore Defendant City of New York,

that prosecutors would commit misconduct in the Majors' case, including withholding

*Brady* material and failing to correct false testimony.

243. The foregoing violations of federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the City, amounting to affirmative policies, practices, and customs, and deliberate indifference to the constitutional rights of persons, including Majors, subject to prosecution by the QCDAO, namely, those identified above in ¶ 239 and the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

   a. the continuing duty to obtain, to preserve, and to make timely disclosure to the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct;

   b. the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, pretrial hearings, and trial;

   c. the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means.

244. All of the above unlawful policies, practices, procedures, and customs of defendant City were a substantial factor in bringing about the violations of plaintiff's

rights under the Constitution and laws of the United States and in causing his

wrongful conviction, imprisonment and related damages.

## CLAIM II

**42 USC § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial (Against Defendants Heider, Sapraicone and Calantjis)**

245.  Majors hereby incorporates and references all of the foregoing paragraphs and further alleges as follows:

246.  Defendants, acting individually and in concert, fabricated evidence, concealed material exculpatory and impeachment evidence, and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Majors of his Fourth, Fifth, Sixth and Fourteenth Amendment rights.

247.  Defendants Heider, Sapraicone and Calantjis deliberately and recklessly coerced and/or fabricated statements from witnesses, including but not limited to Kerwin Charles, Reuben Cherena and Bernard Johnson, and concealed additional material, exculpatory and impeachment evidence concerning witness interviews conducted by them in the case.

248.  Defendants Heider, Sapraicone and Calantjis, committed to framing Majors, deliberately and recklessly failed to investigate Majors' alibi, and leads pointing toward other suspects, including McKinney, "Rasheed"/"Country", Ammon Boone, or the SpeedStick gang.

249.    The defendants' deliberate conduct undermined probable cause to arrest, to indict
and to prosecute Mr. Majors.

250.    Defendants Heider, Sapraicone and Calantjis knowingly and deliberately chose not
to document or disclose to the prosecutors information that was favorable and
material to Mr. Majors' defense. The suppressed evidence included but is not limited
to:

a.    That Cherena described the driver of the green Aerostar as resembling McKinney.

b.    Bernard Johnson's statement that Majors did not participate in The Crime.

c.    The McKinney Affidavit. While The Investigative Detectives disclosed the
Affidavit to QCDAO prosecutors, they chose not to incorporate the McKinney
Affidavit into a DD5 so as to conceal its existence.

d.    The Stone DD5s and Stone statements, which, if not concealed from defense
counsel by the QCDAO, were concealed from the QCDAO by police.

251.    The Defendants Heider, Sapraicone and Calantjis manufactured, created, and
forwarded to the prosecutor false evidence that was reasonably likely to influence a
jury to convict, or alternatively the prosecutor's decision to prosecute including, but
not limited to:

a.    The unduly suggestive Charles lineup identification of Majors;

b.    The unduly suggestive Cherena lineup identification of Majors;

c.    The Bernard Johnson false and coerced confession that implicated Majors as
participating in the Crime.

252. If the Defendants' fabrications and exculpatory and material impeachment evidence known to them had been documented and/or disclosed, such evidence would have tended to prove Majors' innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony.

253. The aforesaid conduct, which Defendants committed, operated to deprive Mr. Majors of his rights under the Constitution and the laws of the United States:

    a. Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fourth, Fifth, Sixth and Fourteenth amendments to the United States Constitution;

    b. Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

    c. To be timely informed of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

254. No reasonable police officer in 1997-1998 would have believed that the actions taken by the Investigative Detectives in fabricating evidence, failing to document and

disclose material, exculpatory evidence, and failing to investigate exculpatory evidence, were lawful.

255. The forgoing violations of Plaintiff's federal constitutional rights by the defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

256. In manufacturing and withholding material exculpatory and impeachment information from prosecutors, Defendants caused Majors to be charged, prosecuted and convicted based on false evidence and deprived Majors' defense of *Brady* information in violation of his clearly established Fifth, Sixth and Fourteenth Amendment right to due process and a fair trial.

257. As a direct and proximate result of the defendants' actions, Majors was wrongly convicted and imprisoned for over ten years for crimes he didn't commit, on top of the 12 years he served for weapons possession, and he suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM III

**42 U.S.C. §1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (Against Defendants Heider, Sapraicone and Calantjis)**

258. Defendants Heider, Sapraicone and Calantjis, despite knowing that probable cause did not exist to arrest and prosecute Majors for The Crime and despite the fact that

although the grand jury's probable cause determination was vitiated by the Investigative Detectives' undisclosed misconduct and by their concealment of material, exculpatory and impeachment evidence, acted individually and in concert to cause Majors to be wrongfully arrested and prosecuted for two counts of attempted murder, robbery and criminal possession of stolen property.

259. Defendants Heider and Sapraicone lacked probable cause to initiate the prosecution of Majors, and the indictment and conviction of Majors was procured by fraud, perjury, the manipulation of witnesses and the fabrication and suppression of evidence.

260. As set forth above, Defendants Heider, Sapraicone and Calantjis gave false and fabricated "evidence" implicating Majors to the prosecutor, to the grand jurors, to the trial jury and to the Hon. John B. Latella presiding over the Bench trial. These Investigative Detectives also concealed exculpatory evidence from these same persons.

261. Defendants Heider, Sapraicone and Calantjis acted with malice, knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict and prosecute Majors, including but not limited to the facts that false evidence was presented to the grand jury and that additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Majors.

262.   The deliberate and reckless investigative failure of the defendants included but was not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, and failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to fingerprint evidence.

263.   Notwithstanding the fact that no forensic evidence connected Majors to The Crime and that the police received evidence shortly after the Crime that "Rasheed," McKinney and/or Ammon participated in the Crime and that eyewitnesses Stone's description of the perpetrator did not match Majors in age, height, weight and hairstyle, and notwithstanding that Boone and Johnson while implicating themselves simultaneously exculpated Majors as participating in The Crime, and notwithstanding that the defendant Investigative Detectives had reason to know that Majors was at his chiropractor's office at the time The Crime was committed, nevertheless, Heider, Sapraicone and Calantjis refused to investigate any evidence that might exculpate Majors.

264.   Defendants Heider, Sapraicone and Calantjis charged Majors despite the fact that they possessed evidence that Majors was innocent.

265.   This conscience-shocking failure to investigate obvious and known exculpatory leads deprived Mr. Majors of his liberty, in violation of the Fourth and Fourteenth Amendments.

266.   The overwhelming evidence of Majors' innocence, included:

a. Johnson's statement to McKinney confessing that he, together with Boone, committed the Crime and that Rasheed, not Majors, was the third perpetrator; and

b. Desiree Stone's description of the perpetrator that did not match Majors in height, age, weight or hairstyle; and

c. Aaron Boone's statement to police exculpating Majors; and

d. The absence of forensic evidence pointing to Majors and the presence of Ammon Boone's fingerprints in the getaway van; and

e. That the motorist Cherena provided a description of the perpetrator that matched McKinney, who was a member of Speedstick.

267. Defendants Heider, Sapraicone and Calantjis' misconduct was critical to the continued prosecution of Majors.

268. On October 20, 2020 the prosecution for The Crime terminated in Mr. Majors favor when the indictment for the two counts of attempted murder and robbery were dismissed with prejudice.

269. As a direct and proximate result of the defendants' actions, Mr. Majors was wrongly prosecuted, convicted, and imprisoned and suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM IV

**42 U.S.C. § 1983 Civil Conspiracy, Concerted Action, Aiding and Abetting; Heider, Sapraicone and Calantjis and the CITY**

270. Majors repeats and realleges each and every aforementioned allegation and incorporates them here and in all following paragraphs.

271. Heider, Sapraicone and Calantjis all explicitly and/or implicitly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Majors wrongfully prosecuted and convicted, without knowledge of exculpatory evidence, and to preserve his wrongful conviction and to cover-up each other's misconduct.

272. Each defendant then committed overt acts, *as detailed above*, to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting, charging and prosecuting Majors for the attempted murder and robbery, and (b) covering-up those actions and suppressing the *Brady/Giglio* material that undermined the case against Majors.

273. By virtue of the foregoing, defendants are liable for conspiring to fabricate evidence and to deprive Majors of his right to the timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

274. Heider, Sapraicone and Calantjis committed the foregoing violations of Majors' constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

275. By reason of the foregoing, those defendants are liable to Majors pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages detailed in ¶ 288, *infra*. above.


## CLAIM V

**Malicious Prosecution Under New York Law: Heider, Sapraicone and Calantjis and CITY**

276. Majors realleges each and every aforementioned allegation of this Complaint, and incorporates them here and in all following paragraphs.

277. By virtue of the foregoing, Heider, Sapraicone and Calantjis acting in concert with each other, initiated, continued, and/or caused the initiation or continuation of criminal proceedings against Majors.

278. The criminal proceedings for The Crime terminated in Majors favor.

279. There was no probable cause for the commencement or the continuation of the criminal proceedings.

280. Defendants fabricated inculpatory evidence and withheld exculpatory evidence in order to support the decision to unlawfully charge and prosecute Majors.

281. The Defendants acted with actual malice.

*282.* Defendant City is liable for these wrongs under the principle of *respondeat superior.*


## CLAIM VI

**New York State Constitutional Due Process Claim Against The City Pursuant To *Respondent Superior***

283.     Majors realleges each and every aforementioned allegation contained in this

Complaint, and incorporates them here and in all following paragraphs.

284.     Heider, Sapraicone and Calantjis by virtue of their acts and omissions detailed

above, violated Majors' rights under the Due Process and Equal Protection provisions

of the New York State Constitution (a) to be free of unlawful arrest not based on

probable cause, (b) to due process of law, (c) to a fair trial, (d) to not be convicted

based on false or misleading evidence and argument, and suppression of *Brady*

material, (e) and to not be incarcerated when actually innocent.

285.     As a direct and proximate result of these defendants' acts and omissions, Majors

was wrongfully arrested, prosecuted, convicted, and wrongfully imprisoned for over

10 years, and suffered other grievous and continuing injuries set forth above.

286.     The City is liable under *respondeat superior* for the acts and omissions of its

employees, Heider, Sapraicone and Calantjis within the scope of their employment,

for the resulting damages.


II.     <u>DAMAGES AND INJURIES</u>

287.     As a direct and proximate consequence of the aforementioned actions by the

defendants, plaintiff:

a.   Suffered over 10 years of wrongful imprisonment;

b.   Suffered physical injuries and physical sickness;

c.  Was subjected to degrading, dehumanizing and emotionally destructive conditions;

d.  Endured the constant despair of believing he would die in prison for a crime he didn't commit, due to his 50 years-to-life sentence for attempted murder and robbery;

e.  Suffered and continues to suffer mental and emotional distress and harm;

f.  Was denied the opportunity to pursue normal relationships with his family and his friends;

g.  Was publicly shamed, disgraced, ridiculed and suffered damage to his reputation;

h.  Suffered the loss of the services, society, companionship, and consortium of his wife, mother, father, sisters, brothers, nephews and nieces;

i.  At the time of Plaintiff's arrest, he was employed as an admitting clerk at Queens Hospital Center, Jamaica New York and has lost substantial employment income;

j.  Paid legal fees and expenses necessitated by exhaustive investigation and litigation to uncover the QCDAO's misconduct;

k.  Incurred other items of attendant damages.


WHEREFORE, MAJORS demands judgment against defendants as follows:

a.  For compensatory damages of not less than $30,000,000;

b.  For punitive damages against the individual defendants of $15,000,000;

c.  For lost wages and permanent diminution of his earning potential of not

less than $2,000,000;

d.  For reasonable attorneys' fees, together with costs;

e.  For pre-judgment interest allowed by law; and

f.  For such other and further relief as this Court may deem just and proper.


DATED:      Yonkers, New York

            September 10, 2021


                        /s/ Thomas Hoffman
                         Thomas Hoffman, ESQ.
                        Law Offices of Thomas Hoffman, P.C.
                        37 Elaine Terrace
                        Yonkers, New York 10701-5257
                        Office: (212) 581-1180
                        Cell: (917) 589-6156
                        Email: thoff93452@aol.com


                        /s/ Jonathan Hiles
                        Jonathan Hiles, Esq.
                        285 Riverside Drive
                        Apt 4C
                        New York, New York 10025
                        (646) 823-6116
                        jonathanghiles@gmail.com


                        *Attorneys for Plaintiff Robert Majors*